## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

LAKEWOOD WATER DISTRICT,

               Plaintiff,

    *v.*

THE UNITED STATES OF AMERICA; THE
DEPARTMENT OF THE AIR FORCE; THE
DEPARTMENT OF THE ARMY; THE
DEPARTMENT OF DEFENSE; 3M
COMPANY (f/k/a Minnesota Mining
Manufacturing, Co.); TYCO FIRE
PRODUCTS LP (successor-in-interest to the
Ansul Company); ANGUS
INTERNATIONAL SAFETY GROUP, LTD.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CHEMGUARD, INC.; THE CHEMOURS
COMPANY; CHUBB FIRE, LTD.; E.I. DU
PONT DE NEMOURS AND COMPANY;
KIDDE-FENWAL, INC.; KIDDE PLC, INC.;
NATIONAL FOAM, INC. (successor-in-
interest to Angus Fire Armour Corp.);
RAYTHEON TECHNOLOGIES
CORPORATION (f/k/a United Technologies
Corporation); and UTC FIRE & SECURITY
AMERICAS CORPORATION, INC.,

               Defendants.

Civil Action No.: _____

**COMPLAINT AND JURY DEMAND**

Lakewood Water District ("District"), by and through its attorneys, hereby alleges as follows:

**SUMMARY OF CLAIM**

1.      The District brings this action for injunctive relief, damages and reimbursement of costs incurred, and which continue to be incurred, to address the presence of per- and polyfluoroalkyl substances ("PFAS")—including, but not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS")—in the District's groundwater supply wells.

2.      PFAS, including PFOA and PFOS, are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFAS can cause serious health impacts.

3.      The United States, the Department of the Air Force ("Air Force"), the Department of the Army ("Army"), and the Department of Defense ("DOD") (together, "Federal Defendants," or "United States"); as well as 3M Company, Angus International Safety Group, Ltd., Buckeye Fire Equipment Company, Chemguard, Inc., The Chemours Company, Chubb Fire, Ltd., E.I. du Pont de Nemours & Co., Kidde PLC, Inc., Kidde-Fenwal, Inc., National Foam, Inc., Tyco Fire Products LP, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), and UTC Fire & Security Americas Corporation, Inc. (together, the "Manufacturer Defendants"), are responsible for PFAS released into the groundwater that supplies the District's public water supply system.

4.      For years, Manufacturer Defendants manufactured, sold, and/or distributed compounds and products containing PFAS. These products include the firefighting suppressant agent "aqueous film-forming foam" ("AFFF"), which contains PFAS and is used at airports and military facilities.[1]

---

[1] Unless otherwise noted, all mentions of "AFFF" refer to AFFF containing PFAS, and includes the PFAS component parts of AFFF.

COMPLAINT                                    - 1 -

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

5.      Manufacturer Defendants manufactured and/or distributed and sold AFFF to the United States.

6.      As required under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, 2674, *et seq.* ("FTCA"), the portion of this action bringing tort claims against Federal Defendants is brought against the United States, which includes but is not limited to the Air Force, the Army, and the Department of Defense. The Air Force, the Army, and the DOD are named specifically for purposes of non-FTCA claims pled in this Complaint.

7.      The United States released PFAS to the groundwater through its use of AFFF at Joint Base Lewis-McChord Air Force Base ("JBLM") near Tacoma, Washington. From approximately 1970 until 2016, the Air Force and the Army used AFFF at JBLM for training events and emergency responses.

8.      Prior to consolidation as JBLM in 2010, McChord Air Force Base and Fort Lewis operated as separate military installations. Camp Lewis, a predecessor to Fort Lewis, was founded in 1917 as a training ground for World War I troops. In 1927, Camp Lewis was re-designated as Fort Lewis, and Gray Army Airfield ("Gray Field") was constructed. Fort Lewis continued to expand, becoming a major Pacific military base in the 1980s. It is still heavily relied upon today. McChord Airfield was originally part of Fort Lewis from 1930, until it separated and was renamed McChord Air Force Base in 1947 with the creation of the Air Force. Like Fort Lewis, McChord Air Force Base has expanded since its founding, particularly from 1951 through 1990, and remains a key U.S. military installation for operations in the Pacific region.

9.      Studies have connected the United States' use of Manufacturer Defendants' AFFF to PFAS groundwater contamination at and in the vicinity of JBLM. The United States' failure to properly manage, capture, and contain AFFF used at JBLM has resulted in AFFF releases to the

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

environment, including to soil and surface water at and in the vicinity of JBLM and the District's property. Once released to the environment, the PFAS component of AFFF migrated from AFFF-impacted surface soils to groundwater. Once PFAS entered groundwater beneath JBLM it migrated, and continues migrating, through groundwater from JBLM to the District's downgradient wells. These wells serve approximately 115,000 municipal water customers for household and commercial use.

10.    When the United States became aware of PFAS contamination at JBLM, it shut down its contaminated on-base water supply wells and allocated funds to treat those wells. By shutting down its own wells, the United States increased the groundwater flow away from JBLM, creating an opportunity for PFAS released at JBLM to migrate more quickly to and further contaminate the District's soil and groundwater. The United States has taken no action to prevent PFAS from migrating to the District's wells, nor to treat PFAS in the groundwater from which the District draws water to supply its residential, commercial, light industrial, and wholesale customers.

11.    Manufacturer Defendants knew that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment. Yet they manufactured, distributed, and sold these chemicals with inadequate warning of their toxic effects. They did so without regard to the health of the District's residents or the District's property interests, both of which would foreseeably be damaged once these chemicals infiltrated the environment.

12.    Manufacturer Defendants marketed, distributed, and sold their AFFF with knowledge that it would be used in training exercises, fire control, fire suppression systems, emergency situations, and other ways at Air Force and Army bases such as JBLM.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

13.     Manufacturer Defendants knew such use would release PFAS and other contaminants into the environment.

14.     Defendants'[2] acts and omissions contaminated the District's water supplies with PFAS. This contamination has spread to the Upper and Lower Vashon Aquifers, the Sea Level Aquifer, the Stuck Aquifer, and the Orting Aquifer (collectively, the "Aquifers"), from which the District draws water to supply its customers.

15.     Manufacturer Defendants' negligent development, manufacturing, distribution, marketing and sale of AFFF caused the contamination of the District's groundwater and wells with PFAS.

16.     Through their development, manufacturing, distribution, marketing, and/or sale of AFFF; violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, *et seq.*[3] and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*; and their trespass, nuisance, and negligence, the Manufacturer Defendants proximately caused the District's injuries and damages by contaminating the groundwater.

17.     The United States' release and disposal of PFAS also caused the contamination of the District's groundwater and wells with PFAS. Specifically, due to its RCRA and CERCLA violations, trespass, nuisance, and negligence, the United States, acting through its employees and personnel, caused the District's injuries and damages by contaminating the groundwater.

18.     This action thus arises from the negligent, intentional, wrongful, and illegal nondiscretionary acts and omissions by Defendants that contaminated the District's water supplies.

---

[2] "Defendants" refers to all defendants named in this complaint.
[3] Plaintiffs notified Manufacturer Defendants of their RCRA violations and their forthcoming citizens' suit on May 26, 2020. Once the notice period elapses, Plaintiffs will amend their Complaint to add RCRA claims against Manufacturer Defendants. *See* 42 U.S.C § 6972(b)(2)(A); 40 C.F.R. § 254.2(a)(1).

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

19.      As a result of Defendants' contamination of the District's water supplies, the District has and will continue to incur significant expenses and losses associated with continued water quality testing, designing and constructing filtration systems, potentially removing wells from service, and otherwise responding to and mitigating the impacts of PFAS contamination in its drinking water supplies. The District is also at risk losing, among other things, revenue and customers.

20.      Under RCRA and common law, the District seeks injunctive relief requiring that the Federal Defendants halt all use and disposal of AFFF at JBLM and that Defendants, as necessary: install granulated activated carbon ("GAC") filtration systems and other infrastructure to remediate PFAS on District property; build new wells that draw water from deeper aquifers unaffected by PFAS; and supply the District's customers with alternative water supplies unaffected by PFAS.

21.      Under federal and state law set further below, the District also seeks from Defendants compensatory, consequential and incidental damages; restitution; declaratory judgment; and any additional appropriate relief.

## JURISDICTION AND VENUE

22.      This Court has jurisdiction to hear Plaintiff's claims against the United States pursuant to 28 U.S.C. § 1346(b)(1). On July 22, 2019, the District submitted administrative claims to the Air Force, Army, and DOD for damages pursuant to the FTCA, 28 U.S.C. §§ 1346, 2671, 2674, *et seq.* On January 24, 2020, all agencies denied the District's claims.

23.      The District exhausted its administrative remedies and timely filed this action. 28 U.S.C. §§ 2401(b), 2675.

24.      This Court has jurisdiction to hear the RCRA claims set forth in this Complaint

COMPLAINT                                    - 5 -

under RCRA § 7002, 42 U.S.C. § 6972(a)(1)(B), and the federal question statute, 28 U.S.C. § 1331. This Court also has jurisdiction to award the District all necessary injunctive relief under RCRA § 7002(a), 42 U.S.C. § 6972(a).

25.    On January 29, 2020, pursuant to 42 U.S.C. § 6972(b)(2)(A), 40 C.F.R. § 254.2(a)(1), the District sent a formal notice of intent to file suit under RCRA (the "Notice of Intent") to the United States via registered mail, return receipt requested, with copies to the Administrator and Region 10 Administrator of the U.S. Environmental Protection Agency ("EPA"), the United States Attorney General, and the Washington State Department of Ecology (the "Notified Agencies"). The United States and all Notified Agencies received these notices by February 11, 2020.

26.    More than 90 days have passed since Federal Defendants and the Notified Agencies received the Notice of Intent. The violations complained of are ongoing, likely to recur and, threaten human health and the environment.

27.    The District has complied with RCRA's pre-suit notice provisions and timely asserted its claims. 42 U.S.C § 6972(b)(2)(A); 40 C.F.R. § 254.2(a)(1).

28.    This Court has jurisdiction to hear the CERCLA claims set forth in this Complaint under Section 107 of CERCLA, 42 U.S.C. § 9607(a), and the federal question statute, 28 U.S.C. § 1331.

29.    This Court has jurisdiction to hear Plaintiff's claims against the Manufacturer Defendants pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

30.    This Court also has supplemental jurisdiction over the District's state law claims under 28 U.S.C. § 1367.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

31.     In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

32.     Federal Defendants have waived their sovereign immunity pursuant to RCRA § 6001(a), 42 U.S.C. § 6961(a) and CERCLA § 120(a)(1), 42 U.S.C. § 9601(a)(1).

33.     Venue properly lies in the Western District of Washington pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to this Complaint occurred in that District.

**PLAINTIFF**

34.     Plaintiff Lakewood Water District is a municipal corporation with its principal place of business at 11900 Gravelly Lake Drive SW, Lakewood, Pierce County, Washington, 98499.

35.     The District is a municipal water purveyor with municipal water rights issued by the Washington State Department of Ecology. The District supplies drinking water to approximately 115,000 customers through an interconnected water supply and distribution system. The District's water system is maintained and further regulated by the Washington State Department of Health.

36.     The District's water is drawn from 30 permanent groundwater wells in the Aquifers.

**DEFENDANTS**

37.     Defendant the United States is a sovereign nation and national government and maintains offices at the offices of the President at the White House, 1600 Pennsylvania Avenue, Washington, D.C. 20500.

38.     Defendant the Air Force is a federal agency that maintains offices at 1690 Air Force Pentagon, Washington, D.C. 20330-1670.

COMPLAINT                                            - 7 -

39.     Defendant the Army is a federal agency that maintains offices at 101 Army Pentagon, Washington, D.C. 20310-0101.

40.     Defendant DOD is a federal agency that maintains offices at 1000 Defense Pentagon Washington, DC 20301-1000.

41.     Defendant The 3M Company ("3M") (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation. Its principal place of business is at 3M Center, St. Paul, Minnesota 55144-1000.

42.     Defendant Angus International Safety Group, Ltd. ("Angus International") is a foreign private liability company with its principal place of business at Station Road, High Bentham, Near Lancaster, United Kingdom LA2 7NA. On information and belief, Angus International is registered in England with a registered number of 8441763 and is the corporate parent of National Foam and Angus Fire.

43.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

44.     Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143-2542.

45.     Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware, 19899. On information and belief, Chemours is a successor-in-interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), which was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

46.     Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company with its principal place of business at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

On information and belief, Chubb is registered in England with a registered number of 134210. On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd.; Chubb Security, PLC; Red Hawk Fire & Security, LLC; and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls, & Security, a unit of Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon").

47. Defendant E.I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road Wilmington, Delaware 19805. On information and belief, Chemours is a successor-in-interest to DuPont Chemical.

48. Defendant Kidde PLC, Inc. ("Kidde") is a Delaware corporation with its principal place of business at One Carrier Place, Farmington, Connecticut 06034. On information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

49. Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. and is part of the UTC Climate Control & Security Unit of United Technologies Corporation.

50. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam is the successor-in-interest to Angus Fire Armour Corporation.

51. Defendant Tyco Fire Products LP ("Tyco"), is a Delaware limited partnership with its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. On information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul"). On information and belief, Tyco's governing partners are citizens of Florida, Pennsylvania, and Delaware.

52.     Defendant Raytheon is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, Massachusetts 02451.

53.     Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC Fire & Security") is a Delaware corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. On information and belief, UTC Fire & Security was formerly known as GE Interlogix, Inc. and GE Security Inc.

## FACTUAL ALLEGATIONS

***PFAS pose a threat to human health and the environment.***

54.      PFAS are a family of synthetic chemicals containing fluorine and carbon atoms. As used in this Complaint, the term "PFAS" includes all PFAS that have been or may be detected in the District's water supplies and property, including, *inter alia*, PFOA, PFOS, perfluorononanoic acid ("PFNA"), perflourohexane sulfonic acid ("PFHxS"), and perflurobutanesulfonic acid ("PFBS").

55.     PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid. For this reason, they are effective in products requiring fire resistance or oil, stain, grease, and water repellency.

56.     PFAS are in many products, including, but not limited to: firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

57.     PFAS are not naturally occurring. Thus, PFAS detected in the environment and in humans are attributable to human activity.

58.     Hundreds of PFAS have been manufactured, distributed, and sold in the United States.

59.     The two most widely known and studied PFAS are PFOA and PFOS.

60.     Due to their chemical structure, PFAS do not normally hydrolyze, photolyze, or

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

biodegrade under environmental conditions, and are extremely persistent in the environment and in human tissue.

61.     PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

62.     Studies have shown that PFAS bioaccumulate and biomagnify in humans and wildlife.

63.     Specifically, humans may absorb PFAS from drinking water. PFAS accumulate primarily in the blood stream, kidneys, and liver.

64.     In 2009, EPA issued Provisional Health Advisories ("Provisional Health Advisories") "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 parts per trillion ("ppt") for PFOA ("Provisional Levels") and 200 ppt for PFOS. No sampling was required until 2012.

65.     In May 2016, EPA issued lower Health Advisories for PFOA and PFOS ("Health Advisories"), warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects. EPA announced the Health Advisories on May 19, 2016, and published them in the Federal Register on May 25, 2016.

66.     While EPA has not issued Health Advisories for other PFAS to date, other PFAS compounds likely share similar health risks. For example, EPA has also derived Regional Screening Level values for PFBS, assigning it a Tier 2 toxicity value.

67.     Studies completed in 2015 on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Public Health Service, and the U.S. Department of Health and Human Services also show that PFAS, including PFOA and PFOS, may adversely affect human health and the environment.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

68.     For example: on June 20, 2018, the ATSDR and the U.S. Department of Health and Human Services released a draft toxicological profile for perfluoroalkyls for public comment ("2018 ATSDR Toxics Profile").

69.     The 2018 ATSDR Toxics Profile was prepared pursuant to CERCLA § 104(i), 42 U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS. In it, ATSDR set provisional minimal risk levels for the PFAS analyzed. It concluded that several have long half-lives in humans, and that PFAS exposure can cause several adverse health outcomes.

70.     The 2018 ATSDR Toxics Profile explains that "EPA (2016e, 2016f) has concluded that there is suggestive evidence of the carcinogenic potential of PFOA and PFOS in humans. [The International Agency for Research on Cancer] . . . (2017) concluded that PFOA is possibly carcinogenic to humans (Group 2B)."

71.     Additionally, nonhuman receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem): elevated mortality in unexposed progeny of freshwater macroinvertebrates with exposure in the parental generation, disruption of the endocrine system in wildlife, and liver toxicity.

72.     PFOA is also readily taken up by plants, including wild plants and crops that are grown on contaminated soil, and lead to further bioaccumulation in the food chain.

***Since the 1960s, AFFF has been used and released into the environment, including at JBLM.***

73.     In or about 1966, the United States patented AFFF as a method for extinguishing

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

74.    In 1969, by command of the Navy Department and Marine Corps, DOD issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS. In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6."

75.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

76.    AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations and civilian airports in the United States, including JBLM.

77.    AFFF concentrate containing PFAS is stored in above-ground storage tanks, underground storage tanks, and nonstationary containers. To use AFFF stored in this manner, the concentrate is mixed with water to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

78.    AFFF is designed to coat the fire, blocking its oxygen supply and creating a barrier to extinguish vapors. A film also forms to smother the fire after the foam has dissipated.

79.    Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

80.    AFFF has been released into the environment, including at JBLM, through a variety of practices and mechanisms including: low volume releases of foam concentrate during storage, transfer, or equipment calibration; moderate volume discharge of foam solution for apparatus

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

testing; high-volume, broadcast discharge of foam solution for fire training, fighting, suppression and prevention; and leaks from foam distribution piping between storage and pumping locations.

81.     Safety Data Sheets ("SDSs") (f/k/a Material Safety Data Sheets ("MSDSs")) require that, after AFFF foam is released, spilled, discharged, or disposed into the environment, it must be contained so it does not accumulate in sediment, soil, surface water sewers, or groundwater.

82.     If it is not contained, AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water and/or sewers, and groundwater.

***Manufacturer Defendants supplied AFFF to DOD.***

83.     On information and belief, since the 1960s, Manufacturer Defendants coordinated with DOD to develop AFFF meeting MIL-F-24385 specifications to extinguish fires at military bases, airports, oil refineries, and firefighting training facilities throughout the United States.

84.     On information and belief, Defendant 3M does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF from approximately 1964 through the present. The Air Force purchased 3M's AFFF and used it for fire training and response at military bases and other locations throughout the country, including JBLM.

85.     On information and belief, between 2000 and 2002, Defendant 3M voluntarily phased out its production of some but not all PFAS, and sold AFFF containing PFOS until approximately 2003.

86.     On information and belief, Defendant National Foam does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 1973 through the present.

COMPLAINT                                          - 14 -

87.    On information and belief, Defendant Angus International does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF used for fire training and response at military bases and other locations throughout the country, including JBLM.

88.    On information and belief, Defendant Buckeye does business throughout the United States, including in Washington. From approximately 2003 through the present, Buckeye designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including JBLM.

89.    On information and belief, Defendant Chemguard does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold PFAS-containing AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 1997 on.

90.    On information and belief, Defendant Chemours does business throughout the United States, including in Washington. It designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including JBLM, for decades.

91.    On information and belief, throughout the 1990s, through its association with National Foam, Defendant Chubb obtained patents (under the name Chubb National Foam, Inc.) for AFFF and similar firefighting foams, including Patent No. 5207932, dated May 4, 1993, for alcohol-resistant AFFF.

92.    On information and belief, Defendant Chubb does business throughout the United States, including in Washington. Chubb, through its association with National Foam, designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including JBLM, during the early 2000s under the name Chubb National Foam, Inc.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

93.     On information and belief, Defendant DuPont does business throughout the United States, including in Washington. DuPont designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including JBLM.

94.     On information and belief, Defendant Kidde does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 2000 through 2013.

95.     On information and belief, Defendant Kidde-Fenwal does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 1991 through the present.

96.     On information and belief, Defendants Tyco (and its predecessor Ansul) does business throughout the United States, including in Washington. Tyco, Ansul and National Foam developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 1974 through the present.

97.     On information and belief, Defendant Raytheon does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including JBLM, from approximately 2003 to 2013.

98.     On information and belief, Defendant UTC Fire & Security does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including JBLM.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

99.     On information and belief, Manufacturer Defendants developed, manufactured, marketed, distributed, and/or sold AFFF to the Air Force and the Army at various times throughout the relevant operative period (e.g., approximately 1960 through 2016). During this period, the Air Force and the Army distributed AFFF to military bases and facilities, including JBLM.

100.    On information and belief, some Manufacturer Defendants continue to develop, design, manufacture, market, sell, and distribute AFFF.

***Defendants knew and failed to provide notice that AFFF was toxic.***

101.    On information and belief, by at least the 1970s, Defendants knew of the risks of PFAS, including AFFF, to the environment and human health.

102.    As documented by a research arm of the U.S. Navy in a Naval Ocean Systems Center ("NOSC") study, the military was aware of toxicity studies showing harmful PFAS effects to a variety of organisms dating back to at least 1973.

103.    In addition to reviewing nonmilitary studies, U.S. military investigators conducted their own studies. For instance, in 1973, the Air Force conducted a study to assess AFFF's toxicity effects on fish in controlled laboratory experiments. One AFFF formulation tested, FC-200 Light Water, was manufactured by 3M and was on the Qualified Products List for AFFF meeting military specification MIL-F-24385.

104.    A 1985 literature survey by NOSC concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC references toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour timeframe. NOSC concludes these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."

COMPLAINT                                    - 17 -

105.    3M knew as early as the 1950s that PFAS bioaccumulates in humans and animals.

106.    A 1956 study at Stanford University concluded that the PFAS manufactured by 3M binds to proteins in blood.

107.    By the early 1960s, 3M also understood that PFAS are stable, persist in the environment, and do not degrade.

108.    In 1970, the authors of a scientific journal article conducted tests on a 3M product that contained PFAS and observed that it was "highly derogatory to marine life"; "the entire test program had to be abandoned to avoid severe local stream pollution."

109.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

110.    A 1978 study by 3M on PFOA and PFOS specifically confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

111.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

112.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

113.    The potential loss of profits drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "defensive barriers to litigation."

114.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

COMPLAINT                                    - 18 -

115.    In exchange for providing grant money to researchers, 3M obtained the right to review and edit drafts of papers on PFAS and sought control over when and whether these papers were published at all.

116.    Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, which it had developed more than 50 years earlier. On information and belief, 3M ceased production of PFOS-based AFFF in 2002.

117.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."

118.    In contrast, 3M stated in its news release on the same event that "our products are safe," while extolling their "principles of responsible environmental management" as driving the decision to cease their production.

119.    Defendants had a duty, which they breached, to notify EPA when they had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

120.    Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

121.    By about 1983, MSDSs for certain AFFF products directed users to collect AFFF before discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

COMPLAINT                                          - 19 -

122.    By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of noncombustible materials such as vermiculite, sand, or earth to soak up the product; and containerizing the product for later disposal.

123.    By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination. MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

124.    Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health and environmental risks, or of all precautions they should take—risks and precautions that Defendants knew or should have known existed.

125.    On information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles, at JBLM.

126.    In the 1970s, Manufacturer Defendants began making AFFF that included shorter carbon chain PFAS. On information and belief, those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

127.    On information and belief, some or all of the Manufacturer Defendants continue to develop, manufacture, and/or sell AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than eight carbon atoms ("Long Chain PFAS," like PFOS and PFOA).

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

128.    On information and belief, Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.

129.    On information and belief, Short Chain PFAS are harder to remove from the environment than Long Chain PFAS and can break through carbon filtration systems more easily.

130.    On information and belief, there are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which are economically and technologically feasible.

***The United States knew that AFFF use would cause groundwater contamination.***

131.    At all times relevant to this action, the United States knew that surface soil at JBLM was gravelly and sandy. A 1986 Air Force site report identified that two water-bearing zones exist within the upper 225 feet beneath JBLM, with that closest to the surface being highly permeable. The Air Force specifically noted in this report that the "gravelly soil found throughout much of the basin readily accepts [ ] effluents."

132.    The United States knew the propensity for contaminants placed on the ground at JBLM, including in unlined ponds and pits and other drainage areas, to percolate into the Aquifers.

133.    The United States also knew that water-soluble contaminants like PFAS would migrate through the aquifer with groundwater flow.

134.    In *Clark v. United States*, 660 F. Supp. 1164 (W.D. Wash. 1987), *aff'd*, 856 F.2d 1433 (9th Cir. 1988)—a case involving groundwater contamination caused by the Air Force—the U.S. District Court of the Western District of Washington found it has been "common knowledge [since the 1950s] that groundwater could be polluted and that the pollution could travel great distances from the site of the original contamination. Further, it was generally known before that

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

time that percolation, a process by which substances disposed of would leach into the underlying groundwater, could occur and that groundwater needed to be protected from deleterious leachates." *Id.* at 1171–72 (setting forth findings of fact). These findings have an issue-preclusive effect for claims against the United States involving these matters. *See generally Shoemaker v. City of Bremerton*, 745 P.2d 858, 860 (Wash. 1987) (holding that an issue is precluded when it is identical to an issue decided in an earlier proceeding; there was a final judgment on the merits; the party against whom issue preclusion is asserted was a party to, or in privity with a party to, the earlier proceeding; and applying issue preclusion is not unjust against the party to whom it is applied).

135.    Since at least 1970, the United States has known that AFFF discharge and runoff into surface waters and drainage areas would result in infiltration of water-soluble pollutants like PFAS into groundwater underlying JBLM.

136.    The United States knew the close proximity of the District's drinking water wellfield to JBLM. It was a reasonably foreseeable consequence that the United States, through the Air Force and the Army, would contaminate the Aquifers and the District's wells.

***The United States used and released AFFF at JBLM.***

137.    In 1970, the United States began using AFFF at military installations, including JBLM, during firefighting training activities and to extinguish fuel-based fires.

138.    Approximately 75% of the military's AFFF inventory is PFAS-based. For the past 30 years, 3M was the primary supplier of AFFF to the DOD stock system that supplied military bases, including JBLM.

139.    The military's Qualified Products Database listed 3M AFFF products as early as 1970, and Tyco products as early as 1976. The other Manufacturer Defendants provided AFFF to the DOD at various times from about 1973 to the present.

140.    According to a 2011 DOD risk alert document, "through 2001, the DOD purchased

COMPLAINT    - 22 -

AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF."

141.    JBLM spans over 414,080 acres. Thousands of gallons of AFFF manufactured by Manufacturer Defendants was used and/or stored by the United States at JBLM from approximately 1970 through at least 2018.

142.    The AFFF manufactured by Manufacturer Defendants was expected to reach JBLM without substantial change in the condition in which it was distributed and sold to the Air Force and to the Army, and it did.

143.    Air Force and Army personnel used AFFF in training exercises and other activities at JBLM, including firefighting and explosion training.

144.    The United States discharged and disposed spent AFFF to the environment at JBLM. The United States' discharge and disposal of spent AFFF, including its PFAS component, includes, but is not limited to, releases and discharges into soil and water pathways that connect JBLM to the District's property, wells, and systems.

145.    The Air Force has acknowledged that "once in groundwater, PFAS are highly mobile and will migrate at a velocity near that of groundwater because of their high solubility and law partition coefficient value." Yet at JBLM, the United States shut down its contaminated wells—knowing that doing so would facilitate migration of PFAS in the aquifer and toward District wells.

146.    On information and belief, the United States disposed AFFF at JBLM by, for example, washing it into its stormwater system, which ultimately discharged to Clover Creek.

147.    For instance, training, exercises, and fire response activities occurred on open ground at JBLM, causing PFAS waste to drain into soil, groundwater, surface waters, wetlands,

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

ponds, and ditches.

148.    In a 2018 site inspection report, the United States identified at least 52 potential

source areas located in over 20 general areas at JBLM for AFFF releases, including:

- Fire Training Areas ("FT") numbered 17, 27, 28, and 30-32; Solid Waste Management Unit 47, and "Area of Concern" 15;

- Fire Equipment Testing Areas; Hangars with AFFF Systems, including hangars 1-7, 9-10, 13, 301, 3063, 3098, 3101, 3106, 3146, and 3273;

- AFFF Storage Areas;

- Areas utilizing Emergency Response Equipment;

- Landfills including 4, 5, 12, 13 and 54;

- Multiple locations where personnel used products potentially containing PFAS compounds for various processes;

- Fire Stations 1, 7, 102, and 105;

- Aircraft Accident Response Areas; and

- Various other areas, including: Clover Creek, Historic Wash Rack and Taxiway D, Gray Field Wash Rack, Current Wash Rack, AFFF Sump between Hangars 5 and 6, AFFF Sump between Hangars 9 and 10, AFFF Sump West of Hangar 13, Flight line Infield – 4 Aviation Fuel, Main Bulk Fuel Tank Farm, Stormwater Drainage Swale near Hangar 3273, Stormwater Drainage Swale near Hangar 3146, and Building 3099.

149.    Interviews with JBLM personnel and historical records identified firefighting

training exercises and routine adjustment of the foam spray patterns of Airport Rescue Fire

Fighting ("ARFF") vehicles as the most significant discharges of AFFF directly to the

environment.

150.    During adjustment of ARFF foam spray patterns, foam was sprayed onto and

around the perimeter of runways at the former McChord Air Force Base, now part of JBLM, and

the resultant foam was washed off the runways to adjacent permeable areas. Specific discharge

areas include the area adjacent to Fire Station 105, the taxiway outside Hangar 1, and the area across the taxiway to the northwest of Hangar 2.

151.    ARFF spray patterns were conducted almost daily at the areas described in paragraph 151 until approximately 2010.

152.    When ARFF reservoirs were refilled, "considerable volume of the foam concentrate spill[ed] on the vehicles and ground and was wash[ed] off the pavement to the nearest drain or permeable area."

153.    The fire-fighting training exercises occurred in areas located at McChord Field to the east of the runway, at Fort Lewis' Gray Field on the northeast portion of the airfield, and approximately one quarter mile to the southeast of Gray Field.

154.    The fire training pit of former Fort Lewis known as FTLE17 is a large, shallow swale approximately six feet below the elevation of the adjacent taxiway. Between 1962 and 1982, the military used FTLEl7 for air-crash rescue operation training, and unknown quantities of AFFF to extinguish fuel fires.

155.    Fire Training Areas 27, 28, 30 and 31 were unlined pits covering less than a quarter of an acre each. During training exercises there, the United States filled the bottom of the pit with a few inches of water, then added fuel and ignited it. The fire was then extinguished with AFFF.

156.    From 1960 to at least 1990, the United States conducted at least 24 fire training exercises annually at FT-27, using about 300 gallons of fuel per exercise. Based on this information, while FT-27 was operational, the United States would have used approximately 216,000 gallons of AFFF. Assuming a dilution at 3%, approximately 7.2 million gallons of water contaminated with PFAS would have been discharged to the ground.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

157.    The United States conducted 40 to 50 training exercises at FT-28 for one to two years in the early 1960s. An unknown amount of AFFF was discharged to the environment during the course of those exercises.

158.    From 1955 to at least 1960, the United States conducted at least 35 fire training exercises at FT-30, using about 300 gallons of fuel per exercise. Based on this information, while FT-30 was operational, the United States would have used approximately 52,500 gallons of AFFF. Assuming a dilution at 3%, approximately 1.75 million gallons of water contaminated with PFAS would have been discharged into the ground.

159.    From 1950 to at least 1955, the United States conducted at least 35 training exercises each year at FT-31, using about 300 gallons of fuel per exercise. Based on this information, while FT-31 was operational, the United States would have used approximately 45,000 gallons of AFFF. Assuming a dilution at 3%, approximately 1.5 million gallons of water contaminated with PFAS would have been discharged to the ground.

160.    FT-32, a former firefighting training pit built in 1975 and used until 1990, was lined with clay. Jet fuel was delivered to the pit from a tank through a gravity sprinkler system to minimize spill potential. The pit drained through an oil/water separator into a holding tank and discharged to the sanitary sewer connected to the Publicly Owned Treatment Works ("POTW") at Fort Lewis. During training exercises, the United States filled the bottom of the pit with a few inches of water, added fuel and then ignited it. The fire was then extinguished with AFFF.

161.    From 1975 to 1990, the United States conducted approximately 10 fire training exercises at FT-32 each year using about 300-400 gallons of fuel per exercise. Based on this information, while FT-32 was operational, the United States would have used approximately 52,500 gallons of AFFF. Assuming a dilution at 3%, approximately 1.75 million gallons of water

COMPLAINT                                          - 26 -

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

contaminated with PFAS would have been discharged into the ground.

162.    The Air Force ceased fire training exercises at FT-32 in the early 1990s. The current fire training area (also known as FT-32) was constructed over the old FT-32. The training area pit now drains into an adjacent holding pond and discharges to the sanitary sewer connected to the Publicly Owned Treatment Works at Fort Lewis.

163.    FT-32 was excavated in the late 1990s; the excavated soil was placed in Landfill 13, where it has the potential to leach into the groundwater.

164.    A number of JBLM landfills received municipal wastes that likely contain PFAS sources. The United States, through the Air Force and the Army, disposed of biosolids from its JBLM wastewater treatment plant ("WWTP") in Landfill 5. The United States acknowledges that current treatment processes at JBLM's WWTP are not always effective at removing PFAS. Therefore, biosolids generated by JBLM's WWTP likely contain PFAS. Landfill 5 includes stormwater infiltration.

165.    On information and belief, fire extinguishing systems utilizing AFFF contained very high volumes of PFAS. AFFF was released from the fire extinguishing systems in multiple hangars—for example, in Hangars 4 and 6 in 2012 and 2009, respectively. At Hangar 4, the United States released approximately 3,000 gallons, and the foam accumulated to a depth of approximately 20 feet on the hangar floor. At Hangar 6, the spilled foam accumulated to a depth of approximately three feet on the hangar floor.

166.    In December 2000, a pressurized fiberglass pipe broke in the fire-suppression system of Hangar 2 at McChord Air Force Base, spilling a 1,000 gallon tank of AFFF onto the hangar floor. According to JBLM accounts, much of the spill was caught by catch basins and trenches; however, at least 100 gallons of AFFF made its way through storm drains into Clover

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

Creek flowing through the City of Lakewood.

167.    At McChord Hangars 7 and 13; Gray Field Hangars 3063, 3098, 3106, 3146; and Gray Field temporary building 3099, the reservoirs in mechanical rooms leaked, releasing AFFF concentrate to floor drains connected to the sanitary sewer system. The volume of concentrate released ranged from one pint (at Hangar 3063 mechanical room) to 1,500 gallons (Hangar 13 mechanical room).

168.    Two ongoing low-volume releases occurred at Hangars 6 and 10, releasing an unknown volume of AFFF.

169.    On information and belief, other current or historical sources at JBLM released PFAS to the environment, including dry wells, waterproofing operations for canvas, laundry operations, vehicle wash racks, and hydraulic fluids at the Logistics Center.

170.    The United States conducted testing between January and April 2017 of 23 drinking water sources at JBLM. The tests confirmed the presence of PFAS in five JBLM drinking water wells at concentrations ranging from 78 to 250 ppt, exceeding the EPA's Health Advisory values.

171.    Between June and December 2018, the United States conducted groundwater testing at 50 potential source areas at JBLM, with PFOS and PFOA concentrations exceeding the EPA Health Advisory limits at 44 of those sites.

***Specific and mandatory laws and directives prohibited the United States' actions.***

172.    The United States' PFAS discharges violated mandatory laws, regulations, policies, and instructions, including, but not limited to: mandatory Air Force Instructions; the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*.; the Washington Water Pollution Control Act, Chapter 90.48 RCW; and at least one Executive Order.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

*The United States violated mandatory duties under federal law.*

173.     The Clean Water Act, 33 U.S.C. § 1311, prohibits the discharge of pollutants from a point source into the waters of the United States without a National Pollution Discharge Elimination System ("NPDES") permit.

174.     As of this writing, the primary known PFAS contaminants at and around JBLM, PFOA and PFOS, are not listed as hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*. (40 CFR Part 302, Table 302.4). The Air Force, however, has determined that PFOS and PFOA are "CERCLA pollutants or contaminants."

175.     Further, PFAS, and AFFF containing PFAS, are "pollutants" under the Clean Water Act, 33 U.S.C. § 1362(6).

176.     The United States, through the Air Force, obtained a NPDES permit (No. WA002510-1 issued to McChord Air Force Base) to discharge water from oil/water separator number two to Clover Creek. The permit was in effect at least from 1983 through 1986, and did not allow JBLM to discharge AFFF or other PFAS.

177.     The United States, through the Army, obtained a NPDES permit (No. WA-002195-4 issued to JBLM) to discharge wastewater from outfall 001 at Solo Point Wastewater Treatment Plant. The permit was in effect from April 1, 2012 to April 1, 2017, and did not allow JBLM to discharge AFFF or other PFAS.

178.     The United States, through the Air Force, obtained NPDES permit number WAS-026638 (issued to JBLM) to discharge municipal stormwater to the State of Washington's groundwater and to waters of the United States, including Murray Creek, Clover Creek, and Puget Sound. The permit was in effect from December 25, 2013 to September 30, 2018; it did not allow JBLM to discharge AFFF or PFAS.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

179.    On information and belief, from 1972 to at least 2018, through the actions and omissions described herein, the United States unlawfully discharged PFAS at JBLM from sources including, but not limited to, oil/water separator number two, the municipal separate storm sewer system, and Solo Point Wastewater Treatment Plant.

180.    The United States violated a mandatory duty when it discharged PFAS in violation of these NPDES permits. This United States' actions are also *per se* negligence.

181.    On June 25, 2020, the District submitted a FOIA request for documentation of all NPDES permits issued to JBLM or McChord Air Force Base from 1972 to the present. On July 2, 2020, the District submitted a FOIA request for documentation of all NPDES permits issued to Fort Lewis and/or Gray Army Airfield from 1972 to the present. While the District has not yet received the requested permits, on information and belief, they contain mandatory rules and directives for times relevant to this action prohibiting discharge of AFFF and other PFAS.

**The United States violated mandatory duties under state law.**

182.    The Clean Water Act waives the federal government's sovereign immunity for all state, interstate and local requirements pertaining to water, and makes such requirements (in addition to the Clean Water Act itself) applicable to the United States. 33 U.S.C. § 1323. This statutory provision was and is applicable to the United States at all times relevant to this Complaint.

183.    Under the Washington State Water Pollution Control Act, Chapter 90.48 RCW, it is unlawful to drain or discharge "pollutants" into groundwater without a permit. *See, e.g.,* RCW 90.48.080 and 90.48.160 through 90.48.200.

184.    PFAS, and AFFF containing them, are "pollution" under RCW 90.48.020.

185.    The United States never obtained a state permit to release PFAS or AFFF into groundwater.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

186.     From 1970 through approximately 1991, the United States released PFAS and AFFF into groundwater through the actions and omissions described above. These actions and omissions include, but are not limited to, firefighting training activities, ARFF vehicle spray pattern testing, fire truck testing, emergency response actions, accidental storage releases, and discharge into the stormwater system.

187.     The United States caused PFAS contamination to public and private water supplies, violating RCW 70.54.010.

188.     Through intentional acts, the United States contaminated the groundwater and created a public nuisance violating RCW 7.48.140.

189.     Thus, the United States violated mandatory duties imposed by state law and made applicable to it under 33 U.S.C. § 1323.

190.     The United States' actions violating mandatory duties imposed by state law were intentional and also constitute *per se* negligence.

***The United States violated mandatory duties under Executive Order, Air Force Instructions, and Army Regulations.***

191.     Army protocols for hangar fire suppression systems require temporary measures to prevent AFFF from entering storm drains, drainage ditches, streams, and water courses; prohibit AFFF concentrate or solution from coming into contact with earth; require containment of all AFFF discharge on paved surfaces; require collection of all discharged AFFF, flushing water, and disposal to an EPA-approved wastewater treatment facility that provides secondary treatment; and require submission of a written plan for AFFF containment and disposal methods for approval.

192.     As described above, the Army did not capture, contain, and properly dispose of AFFF released in aircraft hangars at JBLM as required by Army protocols for hangar fire suppression systems. AFFF was intentionally released, discharged, and disposed of into storm

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

drains, drainage ditches, streams, and water courses after use in hangar fire suppression systems. AFFF was discharged directly to the soil or pavement and was not collected and contained.

193.    On information and belief, the Army did not submit a written plan for approval of AFFF containment and disposal methods at JBLM.

194.    The following Army Regulations governed wastewater, water quality, and environmental quality management at JBLM:

a) Army Regulation 200-1, Environmental Protection and Enhancement, March 21, 1997, amended December 13, 2007 (effective through the present) ("AR 200-1").

b) Army Regulation 200-3, Natural Resources – Land, Forest, and Wildlife Management, March 28, 1995 (effective through August 28, 2007) ("AR 200-3"). AR 200-3 is superseded by AR 200-1 (December 13, 2007).

c) Army Regulation 420-1, Army Facilities Management, November 1, 2007, amended December 12, 2008 (effective through the present) ("AR 420-1").

d) Army Regulation 420-49, Utility Services, May 28, 1997 (effective through November 1, 2007) ("AR 420-49"). AR 420-49 is superseded by AR 420-1 (November 1, 2007).

195.    AR 200-1 contains mandatory instructions on how to manage water resources and water quality, requiring the Army to: "control or eliminate sources of pollutants and contaminants to protect water resources; obtain and comply with wastewater discharge permits; and identify and implement pollution prevention initiatives."

196.    On information and belief, from March 21, 1997 to the present, the Army did not control or eliminate sources of PFAS contamination to protect water resources and did not identify and implement pollution prevention initiatives with respect to AFFF use and PFAS releases, as described above. The Army did not comply with wastewater discharge permits as they did not allow for disposal of AFFF/PFAS into the sewer system.

197.    AR 200-3 required Army operations to protect environmentally sensitive areas, specifically aquifer recharge zones, and required "all reasonable efforts…be made to protect the

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

land and water resources to minimize loss, degradation, or destruction… [and] to control sources of pollutants harmful to the land and its resources." It did not do so.

198.    On information and belief, from March 28, 1995 through August 28, 2007, the Army did not protect aquifer recharge zones at JBLM, did not make all reasonable efforts to protect the land and water resources from degradation and destruction from PFAS contamination, and did not control sources of PFAS pollution, as described above.

199.    AR 420-1 and AR 420-49 both require that the Army prevent and control surface and ground water pollution, including oil/water separators, in accordance with AR 200–1. Both regulations also require that wastewater treatment plant effluent be treated to meet NPDES permit requirements.

200.    On information and belief, from May 28, 1997 through the present, the Army did not prevent and control surface and ground water pollution in accordance with 200-1, as described above. Army treatment of wastewater treatment plant effluent did not comply with NPDES permit requirements as the permits did not allow effluent to contain PFAS.

201.    Air Force Instruction 32-1067, dated February 4, 2015, titled Civil Engineering: Water and Fuel Systems ("AFI 32-1067") contains mandatory instructions on handling wastewater and PFAS. The Air Force explicitly states in the instruction that "compliance with this publication is mandatory." On information and belief, AFI 32-1067 became effective on February 4, 2015, and remains in effect.

202.    AFI 32-1067 requires the United States to "collect and manage industrial wastewater (e.g., wastewater discharge from aircraft hangar accidental release of firefighting foam solution) as a hazardous waste per AFI 32-7042, *Waste Management*, if regulations or permit limits prohibit discharging such wastewater into domestic or other non-industrial sewer systems."

COMPLAINT                                    - 33 -

203.    Under RCRA, 42 U.S.C. §§ 6901, *et seq.*, hazardous waste is subject to strict requirements for containment, storage, treatment, and disposal. These requirements govern all Air Force Instructions directing the Air Force to handle industrial wastewater, AFFF discharges, and other PFAS releases as hazardous waste, including, but not limited to, AFI 32-1067 (February 4, 2015); AFI 32-1067 (April 3, 2013); AFI 32-1067 (March 25, 1994); Air Force Regulation ("AFR") 91-10 (January 2, 1990); AFR 91-9 (December 1, 1989); AFI 32-7041 (December 10, 2003), and AFI 32-7041 (May 13, 1994).

204.    AFI 32-1067 prohibits the United States from discharging PFAS, including PFOS, PFOA, PFNA, PFHxS, and PFBS, to sanitary or storm systems unless otherwise permitted. It also prohibits the Air Force from discharging firefighting foam containing PFAS to POTWs or Federally Owned Treatment Works ("FOTWs").

205.    AFI 32-1067 requires the Air Force to capture, contain, and properly dispose PFAS-containing firefighting solutions, including those discharged through fire suppression systems testing and firefighting vehicles, to meet applicable regulatory requirements or policy directives.

206.    Under AFI 32-1067, the Air Force may discharge firefighting solutions that do not contain PFAS to the sanitary sewer only on approval from the receiving POTW or FOTW.

207.    AFI 32-1067 specifies that for all military installations located in the United States, domestic wastewater discharges require a NPDES permit from federal or delegated state regulatory authorities. Installations that discharge to a POTW are indirect dischargers and must comply with applicable POTW regulations, permits, and contractual agreements.

208.    AFI 32-1067 requires that accidental releases of firefighting foam also be captured, contained, and disposed to meet applicable regulatory requirements. A receiving POTW or FOTW must first approve discharge of firefighting foam to the sanitary sewer. If metered release is not

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

approved, then the foam must be contained and disposed of following regulatory standards. Under AFI 32-1067, firefighting foams of all types may not be released to stormwater conveyances.

209. On information and belief, from February 4, 2015 through at least 2018, the United States failed to capture, contain, or treat AFFF.

210. As described above, the Air Force did not capture, contain, and properly dispose as hazardous waste; PFAS in AFFF that were intentionally released, discharged, and disposed of at numerous unpermitted locations at JBLM, including fire training areas, hangar fire suppression systems, firefighting equipment and maintenance areas, and fuel spill and aircraft fire sites.

211. The following Air Force Instructions and Regulations also governed wastewater management at JBLM:

a) Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, December 10, 2003 (effective through February 4, 2015) ("AFI 32-7041"). AFI 32-7041 is superseded by AFI 32-1067 (February 4, 2015).

b) Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, May 13, 1994 (effective through December 10, 2003) ("AFI 32-7041"). AFI 32-7041 is superseded by AFI 32-7041 (December 10, 2003).

c) Air Force Instruction 32-1067, Civil Engineering: Water Systems, April 3, 2013 (effective through February 4, 2015) ("AFI 32-1067"). AFI 32-1067 is superseded by AFI 32-1067 (February 4, 2015).

d) Air Force Instruction 32-1067, Civil Engineering: Water Systems, March 25, 1994 (effective through April 3, 2013) ("AFI 32-1067"). AFI 32-1067 is superseded by AFI 32-1067 (April 3, 2013).

e) Air Force Regulation 91-10, January 2, 1990 (effective through March 25, 1994) ("AFR 91-10"). AFR 91-10 is superseded by AFI 32-1067 (March 25, 1994).

f) Air Force Regulation, 91-9, December 1, 1989 (effective through March 25, 1994) ("AFR 91-9"). AFR 91-9 is superseded by AFI 32-1067 (March 25, 1994).

212. Collectively, Air Force Instructions 32-7041 and 32-1067, and Air Force Regulations 91-10 and 91-9, contain mandatory instructions on handling wastewater discharges from December 1, 1989 through February 4, 2015. All these explicitly state that "compliance with

this publication is mandatory."

213.    AFI 32-7041 (December 10, 2003) and AFI 32-7041 (May 13, 1994) require that discharges to POTWs comply with applicable POTW regulations, permits, and contractual agreements.

214.    Both AFI 32-7041 (December 10, 2003) and AFI 32-7041 (May 13, 1994) prohibit the Air Force from unauthorized discharge of certain industrial wastewaters to domestic wastewater collection systems and require the Air Force to pretreat regulated industrial wastewater to acceptable levels before discharge to domestic wastewater or other nonindustrial sewer systems.

215.    Both AFI 32-7041 (December 10, 2003) and AFI 32-7041 (May 13, 1994) require pretreatment to remove toxic, flammable, and corrosive characteristics from industrial wastewater before discharge into a domestic wastewater system.

216.     Both AFI 32-7041 (December 10, 2003) and AFI 32-7041 (May 13, 1994) require that the Air Force collect and manage industrial wastewater as a hazardous waste per AFI 32-7042, *Solid and Hazardous Waste Compliance*, if pretreatment is not practical or possible, and regulations prohibit discharging such wastewater into domestic wastewater or other nonindustrial sewer systems.

217.    AFI 32-1067 (March 25, 1994), AFI 32-1067 (April 3, 2013), AFR 91-9, and AFR 91-10 require an Air Force base such as JBLM to adopt a standard wastewater treatment procedure to govern the discharge of industrial and nondomestic waste to the sanitary system. Instructions must describe pretreatment requirements, discharge procedures, and limitations for industrial waste and generators must use pollution control techniques in AFI 32-7080, *Pollution Prevention Programs* (formerly AFR 19-15), to minimize pollutant discharges. AFI 32-1067, AFR 91-10, and AFR 91-9 also require treatment of hazardous waste in compliance with RCRA and prohibit

Marten Law LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
(206) 292-2600

discharge of hazardous waste to the collection system.

218.     AFI 32-7041 (December 10, 2003) defines industrial wastewater as "wastewater from industrial activities" and acknowledges that "[EPA] defines 11 categories of industrial activities, some of which may apply to Air Force installations, including: (1) Air and ground transportation facilities…."

219.     AFI 32-7041 (May 13, 1994) requires the Air Force to operate new fire training facilities as zero-discharge facilities that must protect groundwater, include a groundwater monitoring system, and include double-lined basins with leak-detection systems.

220.     Both AFI 32-1067 (March 25, 1994) and AFI 32-1067 (April 3, 2013) requires that the Air Force operate and maintain water pollution control facilities according to AFM 91-32 and plant-specific O&M manuals, which are required for each major facility, and note that fire training activities, vehicle and aircraft wash facilities, and operation and maintenance of oil/water separators require special attention.

221.     On information and belief, from December 10, 2003 through February 4, 2015, the United States failed to comply with the mandatory obligations, including AFI 32-7041. AFFF waste should have been treated as industrial wastewater because it was waste from JBLM, an air and ground transportation facility.

222.     The United States did not collect and manage PFAS as hazardous wastes at JBLM. Instead, PFAS at JBLM were discharged and disposed of into the environment, including into soil, surface water, and groundwater.

223.     On information and belief, from May 13, 1994 through December 10, 2003, the United States failed to comply with AFI 32-7041 at JBLM. AFFF waste should have been treated as industrial wastewater. As industrial wastewater, the Air Force should have pretreated AFFF

Marten Law LLP
1191 Second Ave, Suite 2200
Seattle, WA 98101
(206) 292-2600

before discharging it into the sewer system or should have collected and managed the AFFF as a hazardous waste.

224.    The United States discharged and disposed of AFFF at JBLM into the environment, including into soil, surface water and groundwater. Thus, the United States failed to either pretreat and deliver AFFF waste at JBLM to a POTW pursuant to authorization or to manage the AFFF as hazardous waste.

225.    In addition, on information and belief, the United States failed to operate new fire training facilities as zero-discharge facilities at JBLM with groundwater monitoring systems and double-lined basins with leak-detection systems.

226.    On information and belief, from December 1, 1989 through February 4, 2015, the United States failed to comply with AFR 91-9, AFR 91-10, and AFI 32-1067 at JBLM by failing to have a base standard wastewater treatment procedure for AFFF and by failing to handle PFAS as hazardous waste.

227.    Air Force Instruction 32-7042, Civil Engineering: Waste Management, November 7, 2014, revised February 8, 2017 ("AFI 32-7042"), contains the following mandatory instruction:

> Inherent in the mission of the AF [Air Force] are the associated environmental responsibilities of protecting human health and the environment and ably managing the natural resources whose care has been entrusted to the AF. Where environmentally damaging materials are used, their use is minimized. If the use of such materials cannot be avoided, the spent material or waste is reused or recycled whenever feasible. As a last resort, spent material or waste that cannot be reused or recycled is disposed of in an environmentally safe manner, consistent with the requirements of all applicable laws.

228.    Executive Order 11507, Prevention, Control, and Abatement of Air and Water Pollution at Federal Facilities, February 4, 1970 (effective through December 17, 1973) ("EO 11507") required federal agencies to:

ensure that all facilities under their jurisdiction are designed, operated, and maintained so as to meet the following requirements: . . . . No waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public.

229.    On information and belief, from 1970 to at least 2015, the United States discharged and disposed of PFAS waste at JBLM in violation of AFI 32-7042 (Rev. 2017) and EO 11507, by discharging AFFF into soil, surface water, and groundwater. This violation resulted in groundwater pollution that endangers the health and welfare of the public.

230.    As additional information becomes available regarding the United States' PFAS use, handling, release, and disposal at JBLM, additional instructions, rules, manuals, and directives may be implicated that are not specifically identified or cited in this Complaint. The District reserves the right to incorporate additional laws, rules, manuals, instructions, directives or the like, as additional information is discovered.

***The United States' actions were not grounded in policy.***

231.    The United States' PFAS releases and disposals were not based on considerations of public policy, including social, economic, or political policy.

232.    The laws, rules, directives, permits, instructions, and orders described above forbade PFAS discharges to the environment and established requirements for the Air Force's waste handling. They granted no authority to balance social, economic, or political concerns, and none exist. Moreover, the prohibitions on discharges to the environment are absolute and require no balancing of factors. Thus, none of the United States' actions releasing PFAS to the environment were protected policy determinations.

233.    Furthermore, there was and is no policy benefit to handling and disposing of AFFF in violation of mandatory directives, contaminating groundwater with PFAS, or contaminating the District's drinking water supply.

COMPLAINT                                    - 39 -

234. There is no policy benefit to trespassing on the District's land, acting negligently, and creating a nuisance through PFAS releases into the District's water supply.

235. Properly handling, disposing, and treating PFAS posed and poses no threat to national security or JBLM. In fact, such treatment was and is expressly required by laws and other mandatory requirements, including the United States' directives, discussed above.

***The District has been damaged by Defendants' actions, and that damage is ongoing.***

236. On information and belief, the United States, acting through the Air Force and the Army, owns, operates, and uses JBLM. The United States is now and has always been responsible for activities and operations on JBLM. The United States' actions and omissions asserted herein were made by Air Force and Army employees and personnel.

237. The United States stores and stored AFFF at JBLM.

238. The United States uses and used AFFF at JBLM.

239. In violation of mandatory directives, the United States did, and continues to, discharge and dispose PFAS into the environment, including by spraying, storing, and placing AFFF on land and in water at JBLM.

240. Groundwater data collected by the United States demonstrates that groundwater at JBLM is impacted below AFFF-impacted areas. Once released to the environment at JBLM, PFAS migrated from AFFF-impacted surface soils through the vadose zone to groundwater. Downward migration through the vadose zone occurred through gravity-driven flow of AFFF fluids to the subsurface, through the naturally occurring pore spaces in subsurface soils, and through dissolution in infiltrating rainwater and other sources of recharge that also migrate through the vadose zone.

241. Groundwater beneath JBLM flows downgradient into the Aquifers from which the District's wells draw water.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

242.    PFAS migrated, and continue migrating, from release areas at JBLM into the Aquifers and have contaminated the District's groundwater supply sources, wells, and systems.

243.    The PFAS contamination prevents the District from fully utilizing its property, including its wells.

244.    In March 2016, the United States took its contaminated wells at JBLM offline in response to testing data showing that five wells were contaminated with PFAS at levels exceeding EPA's Lifetime Healthy Advisory Limits: three wells on McChord Air Force Base and two on Fort Lewis.

245.    The United States shut down its wells at JBLM knowing that PFAS had migrated, and continued to migrate, in the Aquifers, and threatened human health and the environment in surrounding areas including the District. The United States' actions compounded the environmental contamination and exposed more of Lakewood to PFAS.

246.    On information and belief, after discovering the PFAS contamination to its drinking water wells at JBLM, the United States took no action to remove the PFAS from its property or groundwater, or to stop PFAS from spreading to the District's property. At this time, all three wells on McChord Air Force Base remain offline and have yet to receive any filtration. Only one of the contaminated wells on Fort Lewis has been treated.

247.    In June 2016, the Public Information Officer of JBLM notified the District of the presence of PFOS and PFOA in JBLM wells, prompting the District to sample its drinking water wells closest to JBLM for PFAS. These and subsequent analyses showed that PFOA, PFOS, PFBS, PFHpA, and/or PFHxS were present in nine of the District's water supply wells.

248.    The District immediately shut down two of its wells at which PFAS were present in groundwater in amounts that approached or exceeded the EPA's lifetime health advisory and

then began designing, constructing, and installing filtration systems for those wells. In October 2019, the District took offline a third well at which PFAS were present in groundwater in amounts that approached or exceeded the EPA's lifetime health advisory. Constructing filtration systems for the District's PFAS-impacted wells required adding and modifying existing infrastructure so such wells could receive and deliver PFAS-free water to the District's customers. The other six wells at which PFAS has been detected in groundwater in amounts below the EPA's lifetime health advisory have remained online and are only used as needed, causing the District to rely heavily on its other wells to supply potable water to its customers. If not for the PFAS contamination, the District would not have incurred these costs.

249.    The PFAS contamination caused by Defendants is not contained and continues to spread into the District's property and groundwater supplies. By shutting down JBLM's contaminated wells, the United States allowed increased migration of PFAS through the Aquifers.

250.    If the Aquifers and contaminated soil are not remediated, PFAS contamination will continue to impact the District's property far into the future due to the nature of PFAS, as described above.

## FTCA CLAIMS (UNITED STATES)

251.    The District incorporates all averments in this Complaint as if restated fully herein.

252.    Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1). Courts resolve questions of liability under the FTCA in accordance with the law of the state where the tortious activity took place. *O'Connell v. United States*, 110 F. Supp. 612, 614–15 (E.D. Wash. 1953).

253.    Claims submitted pursuant to the FTCA must meet the requirements set forth in 28

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

U.S.C. § 1346(b)(1) by being "civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

254.    The District hereby asserts civil claims against the United States for money damages for property damages and losses, which accrued after 1945. The United States, through Air Force and Army employees and officers, proximately caused the District's damages and losses by releasing PFAS to the environment, thereby violating mandatory directives and impermissibly exercising discretion. Under these circumstances, the United States, if a private person, would be liable for trespass, nuisance, and negligence under Washington State law.

**FIRST CLAIM FOR RELIEF– TRESPASS UNDER FTCA (UNITED STATES)**

255.    The District incorporates all averments in this Complaint as if restated fully herein.

256.    The United States trespassed, and continues to trespass, on the District's property, by contaminating the District's property with PFAS. In Washington, "[a] trespass is an intrusion onto the property of another that interferes with the other's right to exclusive possession." *Phillips v. King Cty.*, 968 P.2d 871, 876 n.4 (Wash. 1998). The intrusion occurs when the actor causes something else to enter property, including land and water. *See Arment v. Bickford*, 247 P. 952 (Wash. 1926) (holding water right a sufficient property interest for trespass).

257.    "One is subject to liability to another for trespass…if he intentionally [or negligently]: (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

to remove." *Bradley v. Am. Smelting & Ref. Co.*, 709 P.2d 782, 785 (Wash. 1985).

258.    Trespass is a strict liability tort. It is not necessary that a trespasser knows that it, or some instrumentality under its control, is invading another's land. If the trespasser knows that the consequences are certain, or substantially certain, to result from his act, then he is treated as though the trespass was intentional. The trespass may be caused indirectly, including by the wrongful discharge of contaminants. *Id.*

259.    Trespass may be a permanent or continuing tort. For continuing trespass, the claim continues to accrue as long as tortious conduct continues. *Woldson v. Woodhead*, 149 P.3d 361, 363–64 (Wash. 2006).

260.    The United States intentionally sprayed, dumped, discharged, or disposed of AFFF onto open ground, soil, and water at JBLM during firefighting training, emergency response, and machine calibration activities.

261.    At JBLM, the United States discharged wastewater contaminated with PFAS, AFFF solution, and AFFF sludge into, *inter alia*, the sewer system, unlined pits, drainage ditches, dry wells, sumps, landfills, and Clover Creek, where it leached into the environment.

262.    These actions violated mandatory duties imposed on the United States by federal and state law and therefore constituted *per se* negligence.

263.    PFAS migrated from JBLM through groundwater into the Aquifers, to property owned by the District, and into the groundwater for which the District possesses perfected water rights. This property includes sites on which wells are, or could be, located.

264.     Through intentionally releasing and disposing PFAS waste, the United States has trespassed on the District's property.

265.    The existence of PFAS beneath, and continued migration onto, the District's

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

property in the Aquifers constitute a continuing trespass.

266.    The United States holds no right to possess the District's property.

267.    The United States did not have the District's permission to place PFAS on, in, or beneath the District's property, including sites where the District's wells are, or could be, located.

268.    On information and belief, the United States knows and knew, or should have known, that PFAS migrated or would migrate downgradient into the Aquifers, and into the District's real property and water supply.

269.    The United States intentionally and unreasonably failed to remediate or stop the PFAS contamination from spreading to the District's property and water supplies.

270.    The intrusion of PFAS into the District's property has caused the District to suffer millions of dollars in damages, including costs to: assure water quality through the delivery system by shutting down contaminated wells; educate and prevent customers from ingesting contaminated water; respond to public inquiries and manage public relations regarding the contamination; sample and analyze groundwater monitor and other media; permit, design, construct, maintain, and operate filtration systems; and conduct additional response or remediation activities. The District anticipates it will have to incur over $377 million in future costs to remove PFAS from its groundwater going forward (together, "District's Past and Future Costs").

271.    The United States' trespass has directly and proximately caused damage and destruction to the District's property, causing economic loss.

**SECOND CLAIM FOR RELIEF – NUISANCE UNDER FTCA (UNITED STATES)**

272.    The District incorporates all averments in this Complaint as if restated fully herein.

273.    The United States created and continues to perpetuate a nuisance to the District by releasing and failing to remediate PFAS contamination that unreasonably and substantially

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

interferes with the District's use and enjoyment of its property.

274.    In Washington, a "nuisance is an unreasonable interference with another's use and enjoyment of property[.]" *Kitsap County v. Allstate Ins. Co.,* 964 P.2d 1173, 1185 (Wash. 1998); *see also* RCW 7.48.120 ("Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.").

275.    If an activity is conducted unlawfully and it interferes with someone's use and enjoyment of their property, it is a nuisance *per se*. If the activity is conducted lawfully, it only becomes a nuisance if it unreasonably interferes with a person's use or enjoyment of property. *Tiegs v. Watts,* 954 P.2d 877, 879 (Wash. 1998).

276.    To be unreasonable, and thus actionable, the interference must be unreasonable and substantial. *City of Moses Lake v. United States*, 430 F. Supp. 2d. 1164, 1184 (E.D. Wash. 2006). The reasonableness of an interference is determined by weighing the harm to the aggrieved party against the social utility of the activity. *Kitsap Cty. v. Kitsap Rifle & Revolver Club*, 337 P.3d 328, 339 (Wash. App. 2014). The interference also may be unintentional and negligent or reckless. *Hostetler v. Ward*, 704 P.2d 1193, 1202 (Wash. App. 1985). Conduct constituting a nuisance can include indirect or physical conditions created by the defendant that cause harm. *Bradley*, 709 P.2d at 787. Nuisance may be a permanent or continuing tort. For continuing nuisance, the claim continues to accrue as long as tortious conduct continues. *Wallace v. Lewis County*, 137 P.3d 101, 111 (Wash. App. 2006).

- 46 -                    MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

277.    The United States directly and proximately caused, and continues to cause, PFAS contamination of the District's property. Thus, the United States substantially invaded the District's interests in the use and enjoyment of its property.

278.    The United States violated mandatory duties imposed on it by federal and state law when it used and disposed of PFAS without permits. This constitutes nuisance *per se* and unreasonable interference with the District's use and enjoyment of its property rights.

279.    The United States allowed and continues to allow PFAS to spread beyond JBLM and to further invade the District's property.

280.    The United States' actions have contaminated the District's water supplies with PFAS. Due to the contamination, the District can no longer rely on some of its wells to supply its customers with drinking water without first conducting expensive filtration or other treatment of contaminated groundwater or re-constructing the wells to draw from deeper, less productive aquifers.

281.    The United States' interference is intentional, substantial, and unreasonable. The Air Force and the Army intentionally and unreasonably discharged AFFF by spraying and dumping it directly onto open ground, soil, and water at JBLM during firefighting training, emergency response activities, machine calibration exercises, waste disposal processes, and spills from storage failures.

282.    The United States intentionally and unreasonably discharged PFAS effluent into unlined pits, drainage ditches, dry wells, sumps, the stormwater system, landfills, and to Clover Creek, where it leached into the soil and groundwater.

283.    The United States intentionally and unreasonably failed to contain and handle PFAS effluent and contaminated soil as hazardous waste.

COMPLAINT                            - 47 -

284.    The United States' intentional discharges were made knowing that they would contaminate groundwater and result in PFAS migrating to the District's properties. These discharges continued after the United States knew they had interfered with the use of the District's properties.

285.    In the alternative, the United States' interferences are negligent because the United States should have reasonably foreseen that its AFFF discharges would contaminate groundwater, and the District's properties, with PFAS.

286.    The United States' acts and omissions have caused PFAS's existence beneath, and continued migration onto, the District's property and its presence in the District's groundwater supplies. As a result, the District is compelled to forego use and enjoyment of its property, including certain contaminated wells, which is offensive and injurious, and constitutes a continuing nuisance.

287.    The intrusion of PFAS into the District's property has caused the District to suffer millions of dollars in damages, including the District's Past and Future Costs.

288.    The United States' conduct and other tortious acts have directly and proximately caused damage and destruction to the District's property, causing economic loss.

**THIRD CLAIM FOR RELIEF – NEGLIGENCE UNDER FTCA (UNITED STATES)**

289.    The District incorporates all averments in this Complaint as if restated fully herein.

290.    The United States negligently discharged and disposed of PFAS and is failing to remediate PFAS contamination.

291.    In Washington, a defendant is negligent when the defendant owes a duty to the plaintiff, the defendant breaches that duty, and the defendant's breach causes injury to the plaintiff. *Keller v. City of Spokane,* 44 P.3d 845, 848 (Wash. 2002).

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

292.    The United States owed, and still owes, a duty to the District to maintain its operations and property to prevent a dangerous condition from escaping its land and causing damage to the District's neighboring land. *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1107 (W.D. Wash. 2017).

293.    The United States owed, and still owes, a duty of care to the public to comply with the laws protecting water to ensure it created no health hazards or pollution of drinking water supplies.

294.    The United States' standard of care is defined in part by the numerous directives that required special handling and disposal of AFFF, as well as its permits.

295.    The body of federal and state water law creates a standard of care and the United States' violations of these laws constitute *per se* negligence.

296.    By mishandling and discharging AFFF to the environment, the United States breached its duty to manage its operations and property as a reasonably careful person would.

297.    The United States also breached its duty by failing to follow the standards and requirements of numerous directives that required special handling and disposal of AFFF.

298.    The negligently discharged AFFF contaminated the Aquifers and the District's property.

299.    The United States further breached its duty of care by shutting down its wells at JBLM, thereby exacerbating the spread of PFAS contamination to the District's soil and groundwater, and taking no action to prevent or treat the contamination.

300.    The United States' negligence has and will continue to cause the District to suffer millions of dollars in damages, including the District's Past and Future Costs.

301.    The United States' conduct and other tortious acts have directly and proximately

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

caused damage and destruction to the District's property, causing economic loss.

**FOURTH CLAIM FOR RELIEF – NEGLIGENCE (MANUFACTURER DEFENDANTS)**

302.    The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

303.    Manufacturer Defendants had a duty to manufacture and/or market, distribute, and sell their AFFF in a manner that avoided contamination of the environment, including municipal water supplies, and avoided harm to those who would foreseeably come into contact with its chemical components.

304.    Manufacturer Defendants knew or should have known that the manufacture of AFFF was hazardous to human health and the environment.

305.    Manufacturer Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using PFAS because it was highly probable that the chemicals would migrate into the environment, including the environment at military installations such as JBLM, and contaminate groundwater used as a public water supply.

306.    Knowing of the dangerous and hazardous properties of AFFF, Manufacturer Defendants had the duty to warn of the hazards of consuming water containing PFAS.

307.    The District was a foreseeable victim of the harm caused by the chemical components of Manufacturer Defendants' AFFF.

308.    Manufacturer Defendants negligently designed, engineered, developed, fabricated, and tested AFFF and PFAS, negligently manufactured, and/or distributed and sold AFFF, and negligently created the associated warnings and instructions.

309.    Manufacturer Defendants thereby failed to exercise reasonable care to prevent AFFF and its components from presenting an unreasonable risk to the health of persons who would

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

come in contact with them. Manufacturer Defendants also failed to exercise reasonable care to prevent contamination of public and agricultural water supplies, including the District's water supply.

310.    Manufacturer Defendants' negligent design, engineering, development, fabrication, testing, warnings, and instructions constitute a pattern of continuous and ongoing tortious conduct.

311.    On information and belief, Manufacturer Defendants have engaged and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions.

312.    On information and belief, Manufacturer Defendants have not recalled their AFFF products.

313.    Manufacturer Defendants' breaches of their legal duties have caused PFAS to contaminate the groundwater beneath and around JBLM, including groundwater in the Aquifers that constitute the District's water rights.

314.    Manufacturer Defendants' have caused, and will continue to cause, damage to the District's property due to their negligent manufacture and/or distribution and sale of AFFF, and their negligent misrepresentation and failure to warn causing PFAS to contaminate its water supply.

315.    Manufacturer Defendants' negligent, reckless and/or intentional acts and omissions alleged herein contaminated the groundwater in the Aquifers with PFAS.

316.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the District.

317.    Manufacturer Defendants' conduct, and the resulting contamination of the Aquifers

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

by the chemical components of the Manufacturer Defendants' AFFF, caused the District to incur significant costs.

318.    The District's costs include those to: assure water quality through the delivery system by shutting down contaminated wells; sample and analyze groundwater and other media; respond to public inquiries and manage public relations regarding the contamination; treat groundwater, including filtration systems, operations and maintenance; increase the frequency of water quality testing and monitoring; other media management and disposal; and additional response costs.

319.    In addition, the District has lost the value and marketability of its property and property rights. As a result of the contamination, the District has lost use and enjoyment of its properties and suffered injury.

## FIFTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – FAILURE TO WARN (MANUFACTURER DEFENDANTS)

320.    The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

321.    This cause of action is brought pursuant to Washington State statutory law to include but not limited to Chapter 7.72 RCW.

322.    Under Washington State law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

323.    Although RCW 7.72.030(1) expresses a negligence liability standard, the Washington State Supreme Court has held that "[t]he adequacy of a manufacturer's warnings are to be measured under Washington's strict liability test. *Taylor v. Intuitive Surgical, Inc*., 389 P.3d

517, 528 (Wash. 2017) (applying strict liability standard established in *Restatement (Second) of Torts* § 402A (Am. Law Inst. 1965) to failure to warn claim).

324.    A product is not reasonably safe due to inadequate warnings or instructions if "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030(1)(b).

325.    Where a manufacturer learned, or where a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured, and did not then provide adequate warnings or instructions, the product is not reasonably safe. RCW 7.72.030(1)(c).

326.    In such a case, the manufacturer is under a duty to issue warnings or instructions in the manner of a reasonably prudent manufacturer in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users. *Id.*

327.    At all times relevant, Manufacturer Defendants were in the business of, among other things, manufacturing and/or selling and distributing AFFF.

328.    As manufacturers and/or sellers and distributors of a commercial product, the Manufacturer Defendants had a duty to provide adequate, full instructions, and warnings about the risks of injury posed by their products.

329.    Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Manufacturer Defendants, the Manufacturer Defendants owed a cognizable duty to the District not to contaminate the District's well supply, as well as the environment and groundwater in and

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

around JBLM, with AFFF containing dangerous levels of PFAS. They also owed the same duty to the purchasers and users of the District's water supply.

330.    The storage, use, release, and disposal of Manufacturer Defendants' AFFF at military installations, including JBLM, were foreseeable. Manufacturer Defendants knew or should have known the likelihood that PFAS from AFFF would enter the groundwater and household water supplies, persist there for decades, cause risks to human health and the environment, and harm property.

331.    At the time of the design, manufacture and/or distribution and sale of the AFFF, Manufacturer Defendants knew or should have known of the dangerous properties of their AFFF.

332.    On information and belief, the Manufacturer Defendants at significant times failed to provide sufficient instructions and warnings to the users of AFFF, including the United States. As a result, users were unaware that use and release of Manufacturer Defendants' AFFF to the environment would contaminate groundwater, including drinking water and agricultural water supplies, and cause risks to those exposed to the water supplies.

333.    On information and belief, the Manufacturer Defendants failed to provide adequate instructions and warnings to users that AFFF contamination of the groundwater and soil would pose dangers to human health and the environment at significant times.

334.    Manufacturer Defendants' failure to provide adequate instructions and warnings constitute a pattern of continuous and ongoing tortious conduct.

335.    On information and belief, Manufacturer Defendants failed and continue to fail to provide adequate instructions and warnings, and have not recalled their AFFF products.

336.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release AFFF.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

337. Had Manufacturer Defendants provided adequate warnings, the Air Force and the Army would not have used AFFF or would have taken measures to store, use, discharge, and dispose of AFFF to reduce or eliminate groundwater and soil contamination.

338. Manufacturer Defendants' failure to warn against the likelihood of contamination from their AFFF caused its chemical components, including PFAS, to contaminate the groundwater in the Aquifers.

339. Manufacturer Defendants' failure to warn of the environmental and health impacts caused by releasing their AFFF and its chemical components of their AFFF directly and proximately caused PFAS to contaminate the groundwater in the Aquifers, causing the District to lose the use and benefit of its property and to incur costs to treat the groundwater and soil on its lands.

340. Manufacturer Defendants' failure to provide adequate warnings or instructions renders Manufacturer Defendants' AFFF a defective product.

341. Manufacturer Defendants' conduct, and the resulting contamination of the Aquifers by the Manufacturer Defendants' AFFF, caused the District to incur significant costs.

342. The District's costs include: assuring water quality through the delivery system by shutting down contaminated wells; sampling and analyzing groundwater and other media; responding to public inquiries and managing public relations regarding the contamination; treating groundwater, including filtration systems, operations and maintenance, and filtration media management and disposal; increasing the frequency of water quality testing and monitoring; and other response costs.

343. In addition, the District has lost the value and marketability of its property and property rights.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

## SIXTH CLAIM FOR RELIEF – DEFECTIVE PRODUCT – DESIGN DEFECT
### (MANUFACTURER DEFENDANTS)

344.    The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

345.    This cause of action is brought pursuant to Washington State statutory law, including but not limited to Chapter 7.72 RCW.

346.    Under Washington law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

347.    "A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030(1)(a).

348.    At all times relevant, Manufacturer Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF.

349.    It was foreseeable that toxic chemicals from the AFFF that Manufacturer Defendants manufactured and/or sold and distributed would enter the water supplies of the District and cause damage to its property interests.

350.    Alternative designs and formulations of AFFF were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to the District.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

351.    Further, design, formulation, manufacture, and/or distribution and sale of a product containing chemicals that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

352.    The AFFF manufactured and/or distributed and sold by Manufacturer Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

353.    Manufacturer Defendants' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Manufacturer Defendants' control.

354.    Manufacturer Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

355.    On information and belief, Manufacturer Defendants have sold and distributed, and continue to sell and distribute, AFFF in a tortious manner.

356.    On information and belief, Manufacturer Defendants have not recalled their AFFF product.

357.    Manufacturer Defendants' manufacture and/or distribution and sale of a defectively-designed product caused PFAS to contaminate the Aquifers and to damage the District.

358.    Manufacturer Defendants' design, formulation, manufacture and/or distribution and sale of a defective product renders Manufacturer Defendants strictly liable in damages to the District.

359.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of the District.

360.    Manufacturer Defendants' conduct, and the resulting contamination of the Aquifers

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

by the chemical components of the Manufacturer Defendants' AFFF, caused the District to incur significant costs.

361.    The District's costs include: assuring water quality through the delivery system by shutting down contaminated wells; sampling and analyzing groundwater and other media; responding to public inquiries and managing public relations regarding the contamination; treating groundwater, including filtration systems, operations and maintenance, and filtration media management and disposal; increasing the frequency of water quality testing and monitoring; and other response costs.

362.    In addition, the District lost the value and marketability of its property and property rights.

**SEVENTH CLAIM FOR RELIEF – NUISANCE (MANUFACTURER DEFENDANTS)**

363.    The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

364.    Manufacturer Defendants' manufacture and/or sale and distribution of AFFF constituted intentional, negligent, and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use and enjoyment of the property interests of the District.

365.    Given the chemical properties of PFAS in AFFF, Manufacturer Defendants knew and/or should have reasonably foreseen that using AFFF at JBLM as they intended would result in an invasion of the District's property interests, including obstruction of its use of its water supplies. Through their actions described above, Manufacturer Defendants participated in carrying out the nuisance described above within the meaning of, *inter alia*, Chapter 7.48 RCW.

366.    The unreasonable and substantial interference with the use and enjoyment of the District's property interests includes, but is not limited to: the contamination of groundwater and

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

soil on the District's property, including the source of the District's appropriated water rights; the need to shut down contaminated wells and rely on remaining wells for the District's water; and the exposure to known toxic chemicals manufactured and/or sold and distributed by Manufacturer Defendants.

367.    Manufacturer Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

368.    On information and belief, Manufacturer Defendants have and continue to sell and distribute AFFF in a tortious manner to the date of this Complaint.

369.    PFAS continue to contaminate the District's properties and continue to migrate to the District's properties.

370.    The nuisance caused by Manufacturer Defendants resulted in, and continues to result in, contamination of the District's groundwater supplies.

371.    Manufacturer Defendants' creation of a nuisance caused and is causing substantial and unreasonable interference with the District's property rights.

372.    Manufacturer Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the District.

373.    Manufacturer Defendants' conduct, and the resulting contamination of the Aquifers by the chemical components of the Manufacturer Defendants' AFFF, caused the District to incur significant costs.

374.    The District's costs include: assuring water quality through the delivery system by shutting down contaminated wells; sampling and analyzing groundwater and other media; responding to public inquiries and managing public relations regarding the contamination; treating groundwater, including filtration systems, operations and maintenance, and filtration media management and disposal; increasing the frequency of water quality testing and monitoring; and

COMPLAINT                                    - 59 -

other response costs.

375.    In addition, the District lost value and marketability of its property and property rights.

**EIGHTH CLAIM FOR RELIEF – UNJUST ENRICHMENT**
**(MANUFACTURER DEFENDANTS)**

376.    The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

377.    Manufacturer Defendants profited from the manufacture and/or distribution and sale of AFFF, and continued to do so long after they were aware of the health and environmental risks of their products. Further, on information and belief, Manufacturer Defendants have failed to recall their products to prevent the further release of their AFFF into groundwater and onto the District's properties. Through Manufacturer Defendants' actions and inaction, the Manufacturer Defendants have been unjustly enriched at the expense of the District.

378.    Manufacturer Defendant's enrichment is both unjust under the circumstances and as between these parties. *Puget Sound Security Patrol, Inc. v. Bates*, 396 P.3d 709, 717 (Wash. App. 2017). The District has sustained millions of dollars in damages as a direct result of Manufacturer Defendants' failure to recall their products. Manufacturer Defendants profited from those sales. The District's resulting damages include, but are not limited to: loss of use and enjoyment of its property rights, loss of value of its property and rights, the cost of shutting down contaminated wells, and the cost of monitoring and treating groundwater contaminated with PFAS, including increased water quality testing and monitoring. These damages necessitate an equitable remedy.

379.    The District asks the Court to award the expenditures saved and the profits obtained by Manufacturer Defendants at the expense of the District as a remedy.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

## NINTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT
### (ALL DEFENDANTS)

380.     The District hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

381.     The Court has jurisdiction to award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*

382.     An actual, present, and existing dispute exists between the District and Defendants. The parties have genuine and opposing interests, which are direct and substantial, relating to Defendants' liability and responsibility for the District's damages incurred, and the future costs that the District will incur to abate the continuing PFAS migration and contamination from JBLM.

383.     The possibility of the District incurring future costs necessary to abate the continuing PFAS migration and contamination from JBLM is not unlikely, remote, or speculative.

384.     The District is entitled to entry of a judgment declaring that Defendants are liable for damages and future costs necessary to abate the continuing PFAS migration and contamination from JBLM, under Washington common law and federal statutory law. Such judgment shall be final, conclusive, and binding on any subsequent action or actions to recover further response costs or damages.

385.     The District further requests that this Court, after entering the declaratory judgment prayed for herein, retain jurisdiction over this action to grant the District such further relief against Defendants as is necessary and proper to effectuate the Court's declaration, including an award of costs and entry of an injunction to implement a judgment entered on the District's claims under 28 U.S.C. § 2202.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

## TENTH CLAIM FOR RELIEF – RESOURCE CONSERVATION AND RECOVERY ACT (FEDERAL DEFENDANTS)

386.    The District incorporate all averments in this Complaint as if restated fully herein.

387.    The contamination of the soil and groundwater described above presents an imminent and substantial endangerment to human health and the environment within the meaning of RCRA, 42 U.S.C. § 6972(a)(1)(B).

388.    The citizen suit provision of RCRA allows any "person" to commence an action "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment…." 42 U.S.C. § 6972(a)(1)(B).

389.    Pursuant to 42 U.S.C. § 6903(15), Federal Defendants are "persons," and subject to the citizen suit provisions of RCRA, 42 U.S.C. § 6972.

390.    As set forth in paragraphs 25-27 above, Plaintiff has complied with the notice provisions of 42 U.S.C. § 6972(b)(2)(A) prerequisite to filing a citizen suit against the Federal Defendants under RCRA, 42 U.S.C. § 6972(a)(1)(B).

391.    The PFAS contaminating the District's property and groundwater are "solid wastes," as defined in 42 U.S.C. § 6903(27), because they were discarded material resulting from JBLM operations, and they resulted in the contamination in the groundwater and soil.

392.    The PFAS contaminating the District's property and groundwater are "hazardous wastes," as defined in 42 U.S.C. § 6903(5), because, as described above, they "cause, or

COMPLAINT                                    - 62 -

significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed."

393.    Federal Defendants have jurisdiction over JBLM and are engaged in "activity resulting … in the disposal or management of solid waste or hazardous waste" at JBLM, and are therefore required to comply with the requirements of RCRA, pursuant to 42 U.S.C. § 6961.

394.    As described above, Federal Defendants are each a "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," 42 U.S.C. § 6972(a), which resulted in the contamination of the District's property and groundwater with PFAS.

395.    No remediation of the PFAS contamination of the District's property and groundwater has occurred.

396.    The PFAS contamination of the District's property and groundwater presents or may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the environment and the health of the District's customers.

397.    This Court should issue an injunction, pursuant to 42 U.S.C. § 6972(a), requiring Federal Defendants to immediately investigate and remediate the District's contaminated property and groundwater, including but not limited to addressing all PFAS in same; to halt all use of PFAS on JBLM; and to prevent any PFAS from JBLM from entering the District's soil and groundwater.

398.    This Court should also award the District the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. § 6972(e).

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

### ELEVENTH CLAIM FOR RELIEF – COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT (ALL DEFENDANTS)

399.    The District incorporates all averments in this Complaint as if restated fully herein.

400.    Defendants are "persons," as defined by CERCLA § 101(21), 42 U.S.C. § 9601(21).

401.    JBLM—including but not limited to fire training areas, hangars, fire stations, landfills, aircraft crash sites, and machine calibration areas—and the District's wells (collectively, "Facilities") are "facilities," as defined by CERCLA § 101(9), 42 U.S.C. § 9601(9).

402.    Under CERCLA, "hazardous substances" are defined in part as "any hazardous waste having the characteristics identified under…section 3001 of the Solid Waste Disposal Act [42 U.S.C. 6921]." 42 U.S.C. § 9601(14); *see* 42 U.S.C. § 6921 (defining "hazardous substances" as those that "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed.").

403.    The PFAS contaminating the District's property and groundwater are "hazardous substances" under CERCLA and RCRA, 42 U.S.C. § 6903(5) and 42 U.S.C. 9601(14). As described above, they "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6921; *see also* Factual Allegations, *supra*.

404.    Federal Defendants currently own and operate, and owned and operated the Facilities when PFAS were released into the environment at the Facilities; they also arranged for

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

disposal of those hazardous substances.

405.    Federal Defendants are therefore "covered persons" liable under CERCLA §107(a)(1)-(3), 42 U.S.C. § 9607(a)(1)-(3).

406.    Manufacturer Defendants generated the PFAS and AFFF containing it and arranged for disposal or treatment of those hazardous substances.

407.    Manufacturer Defendants are therefore "covered persons" liable under CERCLA §107(a)(3), 42 U.S.C. § 9607(a)(3).

408.    Defendants' disposal of PFAS are "releases" within the meaning of CERCLA §101(22), 42 U.S.C. § 9601(22), and have resulted in the contamination of the District's property and groundwater.

409.    Federal Defendants are liable under CERCLA §107(a), 42 U.S.C. § 9607(a), because they generate and dispose of PFAS, and generated and disposed of PFAS; they arrange and arranged for disposal or treatment of PFAS; and they own and operate, and owned and operated the Facilities where PFAS were stored, used, disposed, or otherwise released on the Facilities.

410.    Manufacturer Defendants are liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), because they generate and dispose of PFAS, generated and disposed of PFAS, and they arrange for and arranged for disposal or treatment of PFAS.

411.    Federal and Manufacturer Defendants' PFAS releases have caused the District to incur, and to continue to incur, "response" costs within the meaning of CERCLA §§ 101(23)-(25), 42 U.S.C. §§ 9601(23)-(25).

412.    All such costs are necessary and consistent with the National Contingency Plan. 40 CFR Pt. 300.

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

413. The District is entitled to full reimbursement from Federal and Manufacturer Defendants for all such response costs, pursuant to CERCLA §107(a), 42 U.S.C. § 9607(a).

414. Accordingly, Federal and Manufacturer Defendants are strictly, jointly and severally liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs incurred by the District.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and each of them, jointly and severally, and grant the District the following relief:

a) An award to the District of all damages suffered, or that will be suffered, as a result of Defendants' actions, including, without limitation: costs to take PFAS-contaminated wells offline; costs to build, operate, and maintain, filtration and treatment systems for the District's contaminated wells, including those to install pipelines and other infrastructure; costs to manage water quality; costs to collect and analyze samples of groundwater and other media; costs to manage public relations and public inquiries relating to PFAS contamination of the District's property; costs of lost profits and lost customers; the decrease in the value and marketability of the District's property and property rights; the loss of use and enjoyment of the property and property rights; and the annoyance, discomfort, and inconvenience caused to the District by Defendants' PFAS releases to the environment—in an amount of at least $377,358,750;

b) An award to the District, in an amount to be determined at trial, commensurate to the amount of an order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturer Defendants through their manufacture and/or distribution and sale of AFFF;

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

c) A declaration that the Defendants are liable for damages suffered by the District to date, and for costs to be incurred by the District in the future to abate the continuing PFAS migration and contamination from JBLM;

d) Permanent injunctions to abate the imminent and substantial endangerment to health and the environment as follows:

    i. Restraining Federal Defendants from the use or storage of AFFF containing any form of PFAS at JBLM;

    ii. Directing Federal Defendants to immediately abate, contain, and remediate ongoing use and disposal of all PFAS, including, but not limited to, PFOS and PFOA, that may present an imminent and substantial endangerment to health or the environment;

    iii. Directing Federal Defendants to prevent PFAS contamination from entering the District's soil and groundwater; and

    iv. Directing Federal Defendants to pay for costs incurred by the District to continue to monitor and test contaminated wells until all abatement, removal and remediation is complete.

e) An order awarding to the District its attorney fees and costs, as provided by law;

f) An award to the District of pre- and post-judgment interest, as provided by law; and

g) An order and award to the District for all such other and further relief, including equitable and declaratory, as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) the District demands a trial by jury on all claims so triable.

COMPLAINT

MARTEN LAW LLP
1191 SECOND AVE, SUITE 2200
SEATTLE, WA 98101
(206) 292-2600

Respectfully submitted July 16, 2020.

MARTEN LAW, LLP

By: */s/ Jeff B. Kray*
      */s/ Jessica K. Ferrell*
      Jeff B. Kray, Bar No. 22174
      Jessica K. Ferrell, Bar No. 36917
      1191 Second Ave, Suite 2200
      Seattle, WA 98101
      (206) 292-2600
      (206) 292-2601 fax
      jkray@martenlaw.com
      jferrell@martenlaw.com

      Attorneys for Lakewood Water District